UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**IZTOK PLEVNIK**,

           Plaintiff,

           v.     Case No. 23-cv-837 (CRC)

**EUGENE R. SULLIVAN,** *et al.*,

           Defendants.

## MEMORANDUM OPINION

Spinning a yarn that could have been ripped from the pages of Soldier of Fortune magazine, Plaintiff Iztok Plevnik claims he discovered upwards of $16 billion in U.S. currency that had been spirited out of Libya following the death of Muammar Gaddafi only to be hoodwinked out of the cash through a conspiracy hatched by three U.S. government officials and his own lawyer.  After the United States substituted itself for the three federal defendants pursuant to the Westfall Act, the Court dismissed the government from the case because the Federal Tort Claims Act does not abrogate sovereign immunity for certain intentional torts or torts arising abroad.  See Mem. Op. & Order, ECF No. 34.  What remains of Plevnik's complaint is one count of common law fraud against his former attorney, Eugene R. Sullivan ("Sullivan"), and Sullivan's son Gene ("Sullivan II").  That claim centers on the allegation that Sullivan misrepresented that he would serve as Plevnik's attorney when in fact he was pulling a double cross with the corrupt government officials to steal the money for themselves.  Both Sullivans have moved to dismiss for failure to state a claim.  Because the allegations in the amended complaint, even if somehow true, do not identify any actionable misrepresentation, the Court will grant the motions and dismiss the case.

I.  **Background**

The following allegations are taken from the amended complaint and must be treated as true in considering the defendants' motion to dismiss.

Iztok Plevnik boasts a colorful background.  Born in what was Yugoslavia, he purports to have received counterterrorism training from the Secret Service and Navy Seals prior to obtaining U.S. permanent resident status two decades ago.  Am. Compl. ¶ 4.  (He was also a placekicker with the Miami Dolphins, id., a curious but tangential fact for present purposes.)  More recently, Plevnik recounts having worked for a contractor to the International Criminal Court with responsibility for "retriev[ing] evidence or persons relevant to ICC prosecutions."  Id.  Presumably in that capacity (although the complaint is not clear), Plevnik located two large stashes of U.S. currency in Africa—$10 billion in Kenya and $6 billion in the Ivory Coast—that "had been scattered from Libya after the 2011 overthrow and killing of Libya's dictator Muammar Gaddafi."  Id. ¶¶ 11, 19, 23.[1]  Seeking assistance in repatriating the money, Plevnik approached Washington D.C. lawyer Eugene R. Sullivan.  Sullivan was "excited" to hear of the caper when they first met in 2017, then "wanted nothing to do with [it]," then (with encouragement from Rudy Giuliani) "reversed course once again" in July 2020 and signed an agreement to represent Plevnik in exchange for a $50,000 retainer.  Id. ¶¶ 12–14.  As part of the representation, Sullivan sent Plevnik two letters signed by the General Counsel of the Treasury

---

[1] The amended complaint is also muddy as to whether Plevnik claims that he discovered two separate batches of loot or that all or some of the $10 billion he found in Kenya was later taken to the Ivory Coast.  Compare Am. Compl. ¶¶ 21–22 (alleging that Plevnik "abandon[ed] the $10 billion" in Kenya) with id. ¶ 24 (alleging that there was a "$6 billion minimum repatriation with an additional $10 billion waiting in the wings" in the Ivory Coast).  The Court assumes the former for narrative purposes but nothing of substance rides on the correct interpretation.

Department that, as Plevnik describes them, authorized him to repatriate the funds to the United States via wire transfer. Id. ¶¶ 17–18.

Letters in hand, Plevnik traveled to Kenya in December 2020 and "had the $10 billion delivered to the Nairobi police department[.]" Id. ¶ 19. Once there, however, he was told he could not execute a wire transfer without evidence that his efforts were legitimate. Id. Though Sullivan ostensibly "stood by in the event his representation [] was needed," when Plevnik urged him to call the State Department to validate the letters, Sullivan refused. Id. ¶¶ 19–21. Plevnik thus returned to the United States emptyhanded. Id. ¶ 22. Upon his return, Plevnik was interviewed at Sullivan's office by several attorneys from the U.S. Department of Justice about the location of the supposed booty. Id. ¶ 15. Sullivan's son Gene, also a lawyer, attended the interview. Id.

With Nairobi in the rear-view mirror, Plevnik traveled to the Ivory Coast in August 2021 in an attempt to secure the $6 billion that he claims was located there. Id. ¶¶ 23–24. This time, Sullivan assured Plevnik that he would have DOJ officials confirm the authenticity of the Treasury Department letters. Id. ¶ 24. In advance of the trip, Sullivan emailed the diplomatic security attaché at the U.S. embassy in Abidjan, James Billington, stating that the "letters were authentic, and that [Plevnik's] repatriation of the funds was legitimate." Id. ¶ 35. When Plevnik arrived at the embassy, however, Billington "challenged the letters as counterfeit[.]" Id. ¶ 37. Plevnik called Sullivan, who confirmed to Billington that he had personally obtained the letters from the Treasury Department and provided him with the names and phone numbers of two government officials who could also confirm their authenticity. Id. Unpersuaded, Billington detained Plevnik at the embassy for approximately four hours. Id. ¶¶ 38, 41. During this time,

3

Plevnik opines that unknown co-conspirators took the cash from its holding place at an Abidjan police station and replaced it with counterfeit currency. Id. ¶¶ 40, 44.

Meanwhile, Sullivan called Plevnik's wife to caution her that Plevnik "would soon be taken to a dangerous prison and probably killed unless the wife called [] Billington [and] explained that she was an American citizen with children." Id. ¶ 39. Sullivan also assured Ms. Plevnik that Billington would send her instructions on how to secure Plevnik's release. Id. Yet, when Billington contacted Ms. Plevnik, "the website and forms he instructed [her] to visit were dead ends." Id. The next morning, Plevnik was arrested at his hotel by local police and taken to jail for alleged money laundering and misrepresentation of official United States documents. Id. ¶¶ 42–43. A senior Ivorian police official then met with Plevnik, interrogated him, and encouraged him to sign a "falsified statement." Id. ¶¶ 45–46. Plevnik refused but, with the help of an Ivorian lawyer, was nonetheless able to secure his release and return to the United States. Id. ¶¶ 46–47.

Plevnik met with Sullivan soon after his return. Id. ¶ 49. Sullivan inquired whether Plevnik would make another run at repatriating the funds and offered to get him a "black" diplomatic passport to assist his efforts. Id. ¶ 50. Plevnik gave Sullivan $1,000 "taken from the cash to be repatriated from Africa." Id. Forty-five minutes later, Sullivan called to withdraw his representation, stating that Plevnik "had been accused of criminality in both the United States and Ivory Coast and that [his] family would be threatened if he continued to represent" Plevnik. Id. ¶ 51.

Plevnik filed this suit in March 2023 and amended the complaint the following month. The amended complaint alleges that just prior to Plevnik's DOJ interview, in February 2021, the Sullivans, Billington, Billington's State Department supervisor, and one of the DOJ lawyers who

4

interviewed Plevnik entered a conspiracy to induce him to disclose the location of the cash in order to steal it for themselves.  Id. ¶¶ 15–16.  Plevnik accuses the elder Sullivan of personally receiving "at least $10 million" of the loot.  Id. ¶ 34.  Plevnik seeks compensatory and punitive damages for injuries resulting from this ordeal, including disgorgement of all "stolen" funds.  Id. at 12–13.

## II. Legal Standards

Both Sullivans have moved for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6).  To prevail on a Rule 12(b)(6) motion, the defendant bears the burden of demonstrating that "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  See Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002) (cleaned up).  A court evaluating a Rule 12(b)(6) motion must "construe the complaint 'liberally,' granting the plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  Barr v. Clinton, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (quoting Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)).  However, "[a] court need not accept a plaintiff's legal conclusions as true, . . . nor must a court presume the veracity of legal conclusions that are couched as factual allegations."  Alemu v. Dep't of For-Hire Vehicles, 327 F. Supp. 3d 29, 40 (D.D.C. 2018) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2009)).

## III. Analysis

As noted above, the sole claim in the amended complaint is for common law fraud.  "The essential elements of common law fraud are: (1) a false representation (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation."  Bennett v. Kiggins, 377 A.2d 57, 59 (D.C. 1977).  "Fraud is never presumed and must be particularly pleaded," id., "includ[ing] matters such as the

time, place, and content of the false misrepresentations, the misrepresented fact, and what the opponent retained or the claimant lost as a consequence of the alleged fraud." Antoine v. U.S. Bank Nat. Ass'n, 547 F. Supp. 2d 30, 35 (D.D.C. 2008); see Fed. R. Civ. P. 9(b).

Plevnik contends that Sullivan's agreement to represent him in his effort to return the cash he discovered in Africa to the United States was a false and material misrepresentation because Sullivan instead "sabotage[d] the repatriation endeavor to enrich himself and his co-Defendants in violation of his professional duty of honesty and loyalty to Plaintiff." Pl.'s Opp'n to Mot. Dismiss, ECF No. 10 ("Sullivan Opp'n"), at 4–5. In reliance on Sullivan's supposedly illusory legal representation, Plevnik claims he expended significant time and money securing the cash; endured arrest and physical injury in Abidjan; and lost out on a potential whistleblower award to which he would have been entitled if the repatriation had been successful. See Am. Compl. ¶ 59. Gene Sullivan is also liable for the resulting injuries, Plevnik insists, because he "conspired with his father" to perpetrate the fraud. Pl.'s Opp'n to Mot. Dismiss, ECF No. 19 ("Sullivan II Opp'n"), at 11. The Court finds the claims against both defendants unsupported by the facts alleged.

A. Sullivan

First, Sullivan the elder. In his cursory, four-page motion to dismiss, Sullivan contended that the amended complaint attributes only one false statement to him: that "Defendant Sullivan I falsely stated Plaintiff had been accused of criminality in both the United States and Ivory Coast and that Defendant Sullivan I's family would be threatened if he continued to represent Plaintiff." Sullivan Mot. Dismiss at 3 (quoting Am. Compl. ¶ 51). That statement was not actionable as fraud, Sullivan argued, because even if it were false, (1) it was not material to

6

Plevnik's claim concerning the alleged conspiracy to steal the cash and (2) it could not have caused Plevnik's claimed damages, which stem from his arrest in the Ivory Coast.  Id.

Plevnik responded in opposition that Sullivan hadn't looked hard enough at the complaint.  He explained that the fraud claim was not premised on the statement Sullivan highlighted.  Rather, "the flagship false statement repeatedly alleged in the Complaint [is that] the Defendant would represent Plaintiff as his attorney to assist him in repatriating multiple billions of dollars from Africa to the United States Treasury."  Sullivan Opp'n at 4.  "But when Plaintiff sought to enlist Defendant's help," Plevnik continued, "[Sullivan] . . . sabotaged the repatriation endeavor to enrich himself and co-Defendants in violation of his professional duty of honesty and loyalty to Plaintiff."  Id.

After Sullivan neglected to file a reply brief by the deadline, the Court issued a minute order directing him to address Plevnik's retort and the sole paragraph of the amended complaint that references any affirmative representations by Sullivan about being Plevnik's lawyer.  See Min. Order (Oct. 10, 2023).  That paragraph, number 14, states, with emphasis added:

> On or about June 2020, Plaintiff and Defendant Sullivan I met with Rudy Giuliani to sell COVID masks in the United States. The subject changed to Plaintiff's repatriating billions of dollars to the United States from Africa. Mr. Giuliani was electrified by the opportunity and proposed an engagement letter.  It was signed by Plaintiff on July 1, 2020, including payment of a $50,000 retainer. Defendant Sullivan I reversed course once again.  **He** voiced enthusiasm for the Plaintiff's multi-billion-dollar repatriation initiative and **agreed to represent Plaintiff as his lawyer.** In Defendant Sullivan I's numerous subsequent messages to Plaintiff or third parties via email, text messages, or letters, **Defendant Sullivan I invariably represented himself as Plaintiff's lawyer.**

Sullivan's ensuing reply brief contends that the alleged falsehoods in paragraph 14 do not support a common law fraud claim either.  Sullivan Reply, ECF No. 29, at 4.  The Court agrees.

The gravamen of Plevnik's claim is that Sullivan committed legal malpractice.  He did so, according to Plevnik, by agreeing to represent him in his effort to repatriate funds from

7

Africa but later breaching his duty of loyalty to Plevnik by entering a conspiracy with the other defendants to pilfer the money for themselves.  There are several grounds on which a plaintiff can rest a legal malpractice claim.  One is breach of contract: the client alleges that the lawyer violated a provision of a representation agreement.  Another is negligence: the client alleges that the lawyer failed to perform up to an applicable standard of care and harmed the client as a result.  And a third is fraud: the client alleges that the lawyer said something to the client that the lawyer knew was false (or failed to disclose something that the lawyer knew was important) and the client relied on the misrepresentation (or acted in light of the omission) to his detriment.

       Plevnik has taken the third route, via an alleged affirmative misrepresentation.  Yet the "flagship falsehood" he attributes to Sullivan cannot support a fraud claim.  For starters, the complaint does not allege that the statement "[Sullivan] agreed to represent Plaintiff as his lawyer" was false.  Am. Compl. ¶ 14.  To the contrary, it acknowledges that Plevnik and Sullivan entered an attorney-client relationship in July 2020 upon the execution of an engagement agreement and Plevnik's payment of a $50,000 retainer.  See id.  And the complaint is replete with descriptions of legal services that Sullivan provided pursuant to that agreement.  To name just a few, he secured authorization letters from the Treasury Department prior to Plevnik's trip to Kenya in December 2020, id. ¶¶ 17–18; he vouched for Plevnik in advance of his trip to the Ivory Coast in the summer of 2021 and confirmed the legitimacy of the Treasury Department letters once Plevnik was there, id. ¶¶ 35, 37; and he advised Plevnik's wife on how to secure his release from detention at the embassy in Abidjan, id. ¶ 39.  Plevnik may question Sullivan's motives in taking these actions, but he cannot dispute that they were carried out as part of an

attorney-client relationship.  Accordingly, Sullivan's agreement to represent Plevnik was literally true.[2]

Plevnik would no doubt retort that while Sullivan may have been his lawyer in a contractual sense, implicit in the statement "I am your lawyer" is a promise that the lawyer will fulfill his professional and ethical duties in carrying out the representation.  Plevnik frames his claim in precisely those terms.  See, e.g., Sullivan Opp'n at 11 ("Sullivan's centerpiece falsehood to Plaintiff was that he would honestly and loyally represent Plaintiff as his lawyer[.]"); Pl.'s Proposed Surreply, ECF No. 30-1, at 1 (noting that the representation agreement "carries a duty of loyalty").  But these supposedly implied statements cannot ground a fraud claim.  "A contract between an attorney and a client to provide legal representation in exchange for fees includes an implied agreement by the attorney to deal in good faith and to perform with reasonable skill." Shapiro, Lifschitz & Schram, P.C. v. Hazard, 24 F. Supp. 2d 66, 81 (D.D.C. 1998) (citing O'Neil v. Bergan, 452 A.2d 337, 342 (D.C. 1982)).  Breach of the agreement to deal in good faith or failure to perform with reasonable skill can constitute a claim for breach of contract or negligence.  See O'Neil, 452 A.2d at 341–43.  However, a fraud claim "must stand as a tort even if the contractual relationship did not exist" such that "an action for breach of contract would reach none of the damages suffered by the tort."  Choharis v. State Farm Fire & Cas. Co., 961 A.2d 1080, 1089 (D.C. 2008).  Here, without the parties' acknowledged contract for legal

---

[2] The amended complaint also alleges that Sullivan represented to others that he was Plevnik's lawyer. Am. Compl. ¶ 14. Even if such representations could be deemed false, statements to third parties which the plaintiff did not receive or rely on cannot be the basis of a fraud claim. See Jericho Baptist Church Ministries, Inc. (D.C.) v. Jericho Baptist Church Ministries, Inc. (Maryland), No. 16-cv-00647 (APM), 2020 WL 1703937, at *6 (D.D.C. Apr. 8, 2020).

9

representation, Sullivan would have owed no duty of honesty and loyalty to Plevnik. Accordingly, breach of this supposed duty is not actionable as fraud.

While Plevnik stakes his claim on Sullivan's representation that he would serve as his lawyer, the amended complaint references two other affirmative representations by Sullivan after Plevnik returned from his misadventures in August 2021. Namely, the complaint alleges that Sullivan (1) "untruthfully told Plaintiff he could get Plaintiff a black diplomatic passport" and (2) "falsely stated Plaintiff had been accused of criminality in both the United States and Ivory Coast." Am. Compl. ¶¶ 50–51. The Court will address these statements out of an abundance of caution even though Plevnik has disclaimed reliance on them to support his claim.

The complaint does not explain how Sullivan's statement that Plevnik had been accused of criminality was untrue. Indeed, it alleges elsewhere that Plevnik was accused (or at least suspected) of passing false documents by both Mr. Billington and the Ivorian authorities. Id. ¶¶ 37, 42. Nor does Plevnik suggest how the statement caused him any harm. As for the allegation that Sullivan falsely promised to secure Plevnik a "black diplomatic passport," the complaint could be read to indicate that Plevnik paid Sullivan $1,000 in reliance on the statement and received nothing in return. Id. ¶ 50. However, the payment was allegedly "taken from the cash to be repatriated from Africa" and therefore was not Plevnik's to give. See id.; see also Sullivan Reply at 4. To support his claim of detrimental reliance, Plevnik contends that "[g]ood title to abandoned property is acquired by the finder." Pl.'s Proposed Surreply at 2. But he has not alleged any facts to establish that the supposed cash was in fact abandoned, let alone by whom. See Kearns v. McNeill Bros. Moving & Storage Co., 509 A.2d 1132, 1136 (D.C. 1986) (noting that "the burden is on him who alleges abandonment" to establish "clear and unequivocal intent to abandon on the part of the owner"). And even if the money was abandoned, the

10

amended complaint makes clear that it belonged not to Plevnik but to the U.S. Treasury, thus the repatriation effort. Accordingly, Plevnik cannot based a fraud claim against Sullivan on this statement.

  B. <u>Sullivan II</u>

As for Gene Sullivan, Plevnik alleges merely that he "was present at the interview" with DOJ attorneys and that "[t]he interview was to induce Plaintiff Plevnik to disclose the whereabouts of the 6 billion or more dollars to enable it to be stolen by Defendants[.]" Am. Compl. ¶¶ 15–16. Without more, these allegations are insufficient to support a common law fraud claim.

As Sullivan II notes, Plevnik does not point to any allegedly false statement on his part and therefore cannot predicate his complaint against him on fraud itself. <u>See</u> Sullivan II Mot. Dismiss at 3. Still, "civil liability for fraud can be based upon participation in a conspiracy to defraud." <u>Higgs v. Higgs</u>, 472 A.2d 875, 877 (D.C. 1984); <u>see also</u> Sullivan II Opp'n at 4. To successfully allege this form of liability, "[i]t is not necessary to aver facts against an alleged conspirator that satisfy all of the elements of fraud." <u>Higgs</u>, 472 A.2d at 877 (citation omitted). Rather, "a cause of action for civil conspiracy must allege the formation and operation of the conspiracy, wrongful acts done in furtherance of the common scheme, and damages suffered as a result." <u>Id.</u> (citations omitted). But the allegations supporting a conspiracy to commit fraud must be plead "with particularity." <u>Id.</u>; <u>see also</u> <u>Doe v. Roman Cath. Diocese of Greensburg</u>, 581 F. Supp. 3d 176, 190 (D.D.C. 2022) ("Rule 9(b) further governs claims of conspiracy to commit fraud."). Plevnik's conclusory allegation that Sullivan II "entered a conspiracy" is based solely on his presence at the DOJ interview. Am. Compl. ¶¶ 15–16. While it may be "plausible" that Sullivan II would participate in a fraudulent scheme with his father out of financial

11

desperation, as Plevnik contends, the amended complaint does not provide any details, much less a particularized accounting, of the formation of any such conspiracy or the younger Sullivan's specific role in it. See Sullivan II Opp'n at 11–12.

Moreover, Plevnik concedes that Gene Sullivan was not his lawyer or associated with the elder Sullivan's practice, and therefore owed him neither legal representation nor a duty of loyalty. See id. at 11. Thus, even if Sullivan's agreement to represent Plevnik were somehow actionable as fraud, the sins of the father would not befall the son. The claim against Gene Sullivan therefore must be dismissed as well.

## IV. Conclusion

For the foregoing reasons, the Court will grant Defendant Eugene R. Sullivan's Motion to Dismiss [Dkt. No. 9] and Defendant Gene Sullivan's Motion to Dismiss [Dkt. No. 18]. The Court will further grant [30] Plaintiff's Motion for Leave to File Surrebuttal but deny Plaintiff's Motion for Leave [Dkt. No. 31] and Supplemental Motion for Leave to File Treasury FOIA Response [Dkt. No. 33], which seek the introduction of evidentiary materials that are unnecessary for the resolution of the present motions.

With the issuance of an accompanying Order, the claims against all defendants, including the previously dismissed government defendants, will become final. The Court will therefore also deny as moot Plaintiff's Motion for Entry of Final Judgment [Dkt. No. 35] as to the federal defendants.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: January 26, 2024